

# Al Moroccan Empire Consulate at New Jersey state republic

**Moorish Divine and National Movement of the World**

**Northwest Amexem / Northwest Africa / North America / "The North Gate"**

~ Temple of the Moon and Sun ~

~ Societas Republica Ea Al Maurikanos ~

**The True and De jure Natural Peoples ~ Heirs of the Land**

40.7475569" N, 74.2586082" W

2 1 - 54

Affidavit of Fact

## Consular Court

International Document

### W R I T  O F  Q U O  W A R R A N T O

Notice to Agent is Notice to Principal – Notice to Principal is Notice to Agent

===========================================

Certified Mail Article No #7020 1290 0000 5622 3256

===========================================

19th day of Ramadan, 1442 M.C.Y. [May 1, 2021 C.C.Y.]

Colm F. Connolly (acting as) Magistrate
UNITED STATES DISTRICT COURT (Inc.)
District of Delaware
844 N. King Street, Unit 31, Room 4124, 4B
Wilmington, Delaware [Near 19801-3555]



FILED

MAY 12 2021

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Joelle P. Hitch (acting as) Magistrate of
Family Court
STATE OF DELAWARE (Inc.)
500 North King Street, Suite 9400
Wilmington, Delaware [19801]

**RESPONDENT**
Al Moroccan Empire Consulate
at New Jersey Republic
Consul-General - El, Jaleel-Hu
On behalf of Yasmintheresa Garsiyya-Bey
Yasiin Maleek Garsiyya Bey
P.O. Box 760
South Orange, New Jersey Republic
[07079] consulate@treatyrights.org

Marta Dybowski (acting as)
Attorney for COUPER SMITH-HAGANS
LAW OFFICE OF DENISE D. NORDHEIMER, LLC
2001 Baynard Boulevard
Wilmington, Delaware [19802]

Couper Smith-Hagans (U.S. citizen) Alleged father of child
29523 Olympic Drive
Menifee, California 92585

Re: Misrepresented Instruments – PETITION FOR CUSTODY in the FAMILY COURT OF
THE STATE OF DELAWARE / Complaint - No. CN20-02933; Petition No. 20-13401

**Stare Decisis Law**
See **Louisville v. Motley, 211 U.S. 149, 29 S.Ct. 42** *(If any tribunal finds absence of
proof of jurisdiction over a person subject-matter, the case must be dismissed. The accuser bears
the burden of proof beyond a reasonable doubt")*

===========================================

Certified Mail Article No #7020 1290 0000 5622 3256

===========================================

  

For the record, I am Jaleel-Hu El, Consul General and Mohammedan Sharif [Judicial Officer] for the Al Moroccan Empire Consulate at New Jersey state republic, associate of Yasmintheresa Garsiyya-Bey, a natural person, in full life, in propria persona, *sui juris*. Yasmintheresa Garsiyya-Bey is an aboriginal Moorish American national of the Al Moroccan Empire at North America, and a "foreign national" inhabitant in the Delaware state republic. Yasmintheresa Garsiyya-Bey hereby makes a special appearance under duress as authorized representative, ex rel. YASMINTHERESA GARCIA and for her son Yasiin Maleek Garsiyya Bey, an aboriginal Moorish American national of the Al Moroccan Empire at North America. Yasmintheresa consents to me exercising consular jurisdiction in this case over her person and her property – estate in reversion for the enforcement of his treaty rights secured by the Treaty of Peace and Friendship of 1836 between the United States of North America and the Moroccan Empire.

## JURISDICTION

Any case or controversy between Moors / Moorish Americans and citizens of the United States are governed by the Treaty of Peace and Friendship of 1836 between the United States of North America and the Moroccan Empire, and Article III section 2 of the United States Republic Constitution.

The only court having competent jurisdiction to hear and determine any dispute affecting her person or property – estate is a Consular court being authorized by Articles 20 and 21 of the said Treaty of Peace and Friendship of 1836 between the United States of North America and the Moroccan Empire, which aver the following:

> *Article 20 - If any of the citizens of the United States, or any persons under their protection, shall have any dispute with each other, the Consul shall decide between the parties, and whenever the Consul shall require any aid, or assistance from our government, to enforce his decisions, it shall immediately be granted to him.*

> *Article 21 - If a citizen of the United States should kill or wound a Moor, or, on the contrary, if a Moor shall kill or would a citizen of the United States, the law of the Country shall take place, and equal justice shall be rendered, the Consul assisting at the trial, and if any delinquent shall make his escape, the Consul shall not be answerable for him in any manner whatever.*

Consular notification and access must be given for the enforcement of my treaty rights to consular jurisdiction in accordance with stare decisis law in the case Kolovrat v Oregon, 366 US 187, 194, 81 S Ct 922 (1961), which aver the following:

> *"A state cannot refuse to give foreign nationals their treaty right because of fear that valid international agreements may possibly not work completely to the satisfaction of state authorities. Under the supremacy clause of the United States Constitution Art. VI, clause 2, state policies must give way to overriding federal treaties and conflicting arrangement."*

## ERROR

In response to your signed misrepresented instrument – bill of attainer / foreign bill of exchange titled "PETITION FOR CUSTODY IN THE FAMILY COURT OF THE STATE OF DELAWARE", is ineffective, invalid, unconstitutional, notwithstanding, null and void for error and on the grounds of lack of jurisdiction due to the following:

================================
Certified Mail Article No #7020 1290 0000 5622 3256
================================

  

1. This matter is based under color of law by MARTA DYBOWSKI, acting as an agent for the alleged plaintiff, COUPER SMITH-HAGANS, and against the fictitious corporate stateless person / nom de guerre YASMINTHERESA GARCIA within purview of the plausible 14th Amendment, which was held to be ineffective, invalid, null, void, and unconstitutional per the United States of America Congressional Record, Proceedings and Debates of the 90th Congress, 1st Session, Vol. 113 – Part 12, June 12 to June 20, 1967. See attachment **EXHIBIT: A1** – copy of authenticated Congressional Record, Proceedings and Debates of the 90th Congress, 1st Session, Vol. 113 – Part 12. Therefore, this matter does not constitute an actual "case or controversy" under Article III, section 2 of the Constitution for the United States Republic of North America. See **Allen v. Wright, 468 U.S. 737, 751 (1984)** *("The requirement of standing, however, has a core component derived directly from the Constitution. A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.")*

2. THE STATE OF DELAWARE, Inc. lacks jurisdiction because it is not a constitutional court of competent jurisdiction being ordained and established by Congress under Article III, section 1 and 2 of the Constitution of the United States Republic of North America; and it is not a consular court being authorized to hear and decided diversity of citizenship cases between citizens of the United States and free Moors / Moorish Americans under Article 20 and 21 of the Treaty of Peace and Friendship of 1836 between the United States of North America and the Moroccan Empire. See **Louisville v. Motley, 211 U.S. 149, 29 S.Ct. 42** *("If any tribunal funds absence of proof of jurisdiction over a person and subject-matter, the case must be dismissed.);* and see **Elliot v. Peirsol, 26 U.S. 328, 340 (1828),** *("If a court acts without authority, its judgments and orders are regarded as nullities. They are not voidable, but simply void; and form no bar to a remedy sought in opposition to them, even prior to a reversal. They constitute no justification; and all persons concerned in executing such judgments, or sentences, are considered, in law, as trespassers.")*.

3. Yasmintheresa Garsiyya-Bey makes no claim with respect to the fictitious corporate person / nom de guerre title YASMINTHERESA GARCIA, and hereby surrenders and assigns any and all reversionary interest therein to the account of UNITED STATES (Inc.) and subsidiaries for full acquittance and discharge of any obligation in all the void misrepresented instrument titled, "NOTICE OF PARKING VIOLATION", in accordance with, and in reliance on [Title 12 U.S. Code 95a (2)]; and Yasmintheresa Garsiyya-Bey does not accept any liability nor does she consent to stand as surety for YASMINTHERESA GARCIA at any point in time, at any moment, or at any time.

## QUO WARRANTO

YOU ARE HEREBY COMMANDED to produce the following for the record as proof of jurisdiction in accordance with the prerequisites of my '**Due Process Rights**' secured under the **5th Amendment of the Constitution for the United States Republic of North America 1791**:

1) A certified copy of the Delegation of Authority Order from Congress per Article III section 1 of the United States Constitution as proof of THE STATE OF DELAWARE (Inc.) having jurisdiction and judicial authorization to hear and determine diversity of citizenship cases arising under treaty law,

2) A copy of any allege valid and verifiable contract or commercial agreement mutually made between any authorized representative of THE STATE OF DELAWARE (Inc.) and Yasmintheresa, which obliges her to any corporate statue or rule, or to a specific performance by her free consent,

==================================
Certified Mail Article No #7020 1290 0000 5622 3256
==================================

  

3) The name, address, and telephone number of your public hazard and malpractice bonding company and the policy number of the bond, and if required, a copy of the policy describing the bonding coverage of your specific performances as officers/employees/contractors of THE STATE OF DELAWARE (Inc.),

4) A copy of the accusation being signed under oath or affirmation by the alleged injured party (corpus delicti), and

5) Proof of lawful service of process being made upon her.

The foregoing is required to be produced for the record in order to prevent usurpation, ultra vires acts and want of jurisdiction unlawful asserted over her person and / or property under color of state law and by color of authority within purview of the purported **14ᵗʰ Amendment to the Constitution for the United States of America**, which was held to be ineffective, invalid, null, void and unconstitutional per the **United States of America Congressional Record, Proceedings and Debates of the 90ᵗʰ Congress, 1ˢᵗ session, Vol. 113 - Part 12, 1967, Page 15641.**

### DAYS OF GRACE TO ANSWER

You have **fourteen (14) days** from your receipt of this writ of quo warranto to answer and produce the above evidence for the record. THIS CASE CANNOT PROCEED until jurisdiction is proved to exist, otherwise, this case must be dismissed for lack of jurisdiction. See **Melo v. United States, 505 F.2d 1026** *("Once jurisdiction is challenged, the court cannot proceed when it clearly appears that the court lack jurisdiction, the court has no authority to reach merits, but, rather, should dismiss the action")*

### DEFAULT

Failure to answer and produce the above evidence constitutes DEFAULT, and serves as prima facie evidence of your admission by silence to the collusive in rem action and proceedings in this case which was taken under color of state law, including the administrative bill of attainder, being unconstitutional, **notwithstanding**, null and void ab initio for **lack of jurisdiction and fraud**. See **Elliot v. Peirsol, 26 U.S. 328, 340 (1828)** *("If a court acts without authority, its judgments and orders are regarded as nullities. They are not voidable, but simply void, and form no bar to a remedy sought in opposition to them, even prior to a reversal. They constitute no justification and all persons concerned in executing such judgments, or sentences, are considered, in law, as trespassers")*, also, see **United States v. Throckmorton, 98 U.S. 61** *("Fraud violates the most solemn contracts, documents and even judgments")*

In accordance with my retained rights and reserved powers secured under the **9ᵗʰ and 10ᵗʰ Amendments of the United States Republic Constitution of 1791**, a Default Judgment will be issued against you for the total damages mentioned below as a result of your default.

### ALLODIAL COMPENSATION INVOICE

The following damages resulted from the injuries accrued by you, Joelle P. Hitch, and Marta Dybowski (et al)

| Damage | Cost |
|---|---|
| Conspiracy against rights (18 USC 241) | $175,000 |
| Deprivation of rights under color of law (18 USC 242) | $175,000 |
| Fraud | $675,000 |

====================================
Certified Mail Article No #7020 1290 0000 5622 3256
====================================

  

Consulate costs                                        $220,000
Misc. expenses (mailing, paper, ink, etc)              $15,000

**Total:** $1,260,000.00 payable in lawful money of .9999 fine gold bullion coins

### AFFIDAVIT

I affirm by virtue of Divine Law, under the Zodiac Constitution, and upon the United States Republic Constitution, and upon the honor of my Foremothers and Forefathers that the foregoing Writ of Quo Warranto and Affidavit is true and correct.

Executed this 19th day of Ramadan, 1442 M.C.Y. [May 1, 2021 C.C.Y.]



Jaleel-Hu El, Consul General and Sharif [Judicial Officer],
Office of the Al Moroccan Empire Consulate
at New Jersey state republic
All Rights Reserved

Maghrib al Aqsá

C.C.
Kathy Jennings (acting as) Attorney General
Jeffrey W. Bullock, (acting as) Secretary of State of Delaware

  

Duly subscribed and affirmed on this 19th day of Ramadan, 1442 M.C.Y. [May 1, 2021 C.C.Y.], before me, a Wazir [Notary Public] for the Moorish National Republic Federal Government



_____
WITNESS my hand and official seal

_____
Wazir [Notary Public]

OMAR A Brooks -Buy
_____
Printed Appellation

Affidavit of Fact
Certificate of Service

I, Jaleel-Hu El, hereby certify that on this 19th day of Ramadan, 1442 M.C.Y. [May 1, 2021 C.C.Y.], the enclosed Affidavit of Fact, Writ of Quo Warranto [Exhibit A] was sent via USPS certified mail to the following recipient:

Colm F. Connolly (acting as) Magistrate
UNITED STATES DISTRICT COURT (Inc.)
District of Delaware
844 N. King Street, Unit 31, Room 4124, 4B
Wilmington, Delaware [Near 19801-3555]

Certified Mail Article No #7020 1290 0000 5622 3256



UNITED STATES OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 90th CONGRESS
FIRST SESSION

## VOLUME 113—PART 12

JUNE 12, 1967, TO JUNE 20, 1967

(PAGES 15309 TO 16558)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1967

groups from other nations. This bi-partisan organization is doing something more than just talking about international understanding—it is doing something about it.

If mankind is ever to abolish war from the face of the earth, we first must break down the barriers of mistrust and suspicion among the peoples of the world. There is no better way to accomplish this than through just such programs as this one conducted by the American Council of Young Political Leaders.

These young people will be the leaders of the world in years to come. They will be better leaders, more understanding and tolerant leaders, if they are able to expand their knowledge of other nations, other peoples, and other political systems.

This is why, Mr. Speaker, I am so pleased with the work being done by the American Council of Young Political Leaders. They have my wholehearted support in their program to further world understanding.

## THE 14TH AMENDMENT—EQUAL PROTECTION LAW OR TOOL OF USURPATION

Mr. PRYOR. Mr. Speaker, I ask unanimous consent that the gentleman from Louisiana [Mr. RARICK] may extend his remarks at this point in the RECORD and include extraneous matter.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Arkansas?

There was no objection.

Mr. RARICK. Mr. Speaker, arrogantly ignoring clearcut expressions in the Constitution of the United States, the declared intent of its drafters notwithstanding, our unelected Federal judges read out prohibitions of the Constitution of the United States by adopting the fuzzy haze of the 14th amendment to legislate their personal ideas, prejudices, theories, guilt complexes, aims, and whims.

Through the cooperation of intellectual educators, we have subjected ourselves to accept destructive use and meaning of words and phrases. We blindly accept new meanings and changed values to alter our traditional thoughts.

We have tolerantly permitted the habitual misuse of words to serve as a vehicle to abandon our foundations and goals. Thus, the present use and expansion of the 14th amendment is a sham—serving as a crutch and hoodwink to precipitate a quasi-legal approach for overthrow of the tender balances and protections of limitation found in the Constitution.

But, interestingly enough, the 14th amendment—whether ratified or not—was but the expression of emotional outpouring of public sentiment following the War Between the States.

Its obvious purpose and intent was but to free human beings from ownership by another human. Its aim was no more than to free the slaves.

As our politically appointed Federal judiciary proceeds down their chosen path of chaotic departure from the peoples' government by substituting their personal law rationalized under the 14th amendment, their actions and verbiage brand them and their team as secessionists—rebels with pens instead of guns—seeking to divide our Union.

They must be stopped. Public opinion must be aroused. The Union must and shall be preserved.

Mr. Speaker, I ask to include in the RECORD, following my remarks, House Concurrent Resolution 208 of the Louisiana Legislature urging this Congress to declare the 14th amendment illegal. Also, I include in the RECORD an informative and well-annotated treatise on the illegality of the 14th amendment—the play toy of our secessionist judges—which has been prepared by Judge Leander H. Perez, of Louisiana.

The material referred to follows:

### H. CON. RES. 208

A concurrent resolution to expose the unconstitutionality of the 14th amendment to the Constitution of the United States; to interpose the sovereignty of the State of Louisiana against the execution of said amendment in this State; to memorialize the Congress of the United States to repeal its joint resolution of July 28, 1868, declaring that said amendment had been ratified; and to provide for the distribution of certified copies of this resolution

Whereas the purported 14th Amendment to the United States Constitution was never lawfully adopted in accordance with the requirements of the United States Constitution because eleven states of the Union were deprived of their equal suffrage in the Senate in violation of Article V, when eleven southern states, including Louisiana, were excluded from deliberation and decision in the adoption of the Joint Resolution proposing said 14th Amendment; and Resolution was not presented to the President of the United States in order that the same should take effect, as required by Article 1, Section 7; the proposed amendment was not ratified by three-fourths of the states, but to the contrary fifteen states of the then thirty-seven states of the Union rejected the proposed 14th Amendment between the dates of its submission to the states by the Secretary of State on June 16, 1866 and March 24, 1868, thereby nullifying said Resolution and making it impossible for ratification by the constitutionally required three-fourths of such states; said southern states which were denied their equal suffrage in the Senate had been recognized by proclamations of the President of the United States to have duly constituted governments with all the powers which belong to free states of the Union, and the Legislatures of seven of said southern states had ratified the 13th Amendment which would have failed of ratification but for the ratification of said seven southern states; and

Whereas the Reconstruction Acts of Congress unlawfully overthrew their existing governments, removed their lawfully constituted legislatures by military force and replaced them with rump legislatures which carried out military orders and pretended to ratify the 14th Amendment; and

Whereas in spite of the fact that the Secretary of State in his first proclamation, on July 20, 1868, expressed doubt as to whether three-fourths of the required states had ratified the 14th Amendment, Congress nevertheless adopted a resolution on July 28, 1868, unlawfully declaring that three-fourths of the states had ratified the 14th Amendment and directed the Secretary of State to so proclaim, said Joint Resolution of Congress and the resulting proclamation of the

Secretary of State included the purported ratifications of the military enforced rump legislatures of ten southern states whose lawful legislatures had previously rejected said 14th Amendment, and also included purported ratifications by the legislatures of the States of Ohio and New Jersey although they had withdrawn their legislative ratifications several months previously, all of which proves absolutely that said 14th Amendment was not adopted in accordance with the mandatory constitutional requirements set forth in Article V of the Constitution and therefore the Constitution itself strikes with nullity the purported 14th Amendment.

Now therefore be it resolved by the Legislature of Louisiana, the House of Representatives and the Senate concurring:

(1) That the Legislature go on record as exposing the unconstitutionality of the 14th Amendment, and interposes the sovereignty of the State of Louisiana against the execution of said 14th Amendment against the State of Louisiana and its people;

(2) That the Legislature of Louisiana opposes the use of the invalid 14th Amendment by the Federal courts to impose further unlawful edicts and hardships on its people;

(3) That the Congress of the United States be memorialized by this Legislature to repeal its unlawful Joint Resolution of July 28, 1868, declaring that three-fourths of the states had ratified the 14th Amendment to the United States Constitution;

(4) That the Legislatures of the other states of the Union be memorialized to give serious study and consideration to take similar action against the validity of the 14th Amendment and to uphold and support the Constitution of the United States which strikes said 14th Amendment with nullity; and

(5) That copies of this Resolution, duly certified, together with a copy of the treatise on "The Unconstitutionality of the 14th Amendment" by Judge L. H. Perez, be forwarded to the Governors and Secretaries of State of each state in the Union, and to the Secretaries of the United States Senate and House of Congress, and to the Louisiana Congressional delegation, a copy hereof to be published in the Congressional Record.

VAIL M. DELONY,
*Speaker of the House of Representatives.*
C. C. AYCOCK,
*Lieutenant Governor and President of the Senate.*

### THE 14TH AMENDMENT IS UNCONSTITUTIONAL

The purported 14th Amendment to the United States Constitution is and should be held to be ineffective, invalid, null, void and unconstitutional for the following reasons:

1. The Joint Resolution proposing said Amendment was not submitted to or adopted by a Constitutional Congress. Article I, Section 3, and Article V of the U.S. Constitution.

2. The Joint Resolution was not submitted to the President for his approval. Article I, Section 7.

3. The proposed 14th Amendment was rejected by more than one-fourth of all the States then in the Union, and it was never ratified by three-fourths of all the States in the Union. Article V.

#### I. THE UNCONSTITUTIONAL CONGRESS

The U.S. Constitution provides:

Article I, Section 3. "The Senate of the United States shall be composed of two Senators from each State * * *"

Article V provides: "No State, without its consent, shall be deprived of its equal suffrage in the Senate."

The fact that 23 Senators had been unlawfully excluded from the U.S. Senate, in order to secure a two-thirds vote for adoption of the Joint Resolution proposing the 14th Amendment is shown by Resolutions of pro-

test adopted by the following State Legislatures:

The New Jersey Legislature by Resolution of March 27, 1868, protested as follows:

"The said proposed amendment not having yet received the assent of the three-fourths of the states, which is necessary to make it valid, the natural and constitutional right of this state to withdraw its assent is undeniable * * *."

"That it being necessary by the constitution that every amendment to the same should be proposed by two-thirds of both houses of congress, the authors of said proposition, for the purpose of securing the assent of the requisite majority, determined to, and did, exclude from the said two houses eighty representatives from eleven states of the union, upon the pretence that there were no such states in the Union; but, finding that two-thirds of the remainder of the said houses could not be brought to assent to the said proposition, they deliberately formed and carried out the design of mutilating the integrity of the United States senate, and without any pretext or justification, other than the possession of the power, without the right, and in palpable violation of the constitution, ejected a member of their own body, representing this state, and thus practically denied to New Jersey its equal suffrage in the senate, and thereby nominally secured the vote of two-thirds of the said houses."[1]

The Alabama Legislature protested against being deprived of representation in the Senate of the U.S. Congress.[2]

The Texas Legislature by Resolution on October 15, 1866, protested as follows:

"The amendment to the Constitution proposed by this joint resolution as Article XIV is presented to the Legislature of Texas for its action thereon, under Article V of that Constitution. This Article V, providing the mode of making amendments to that instrument, contemplates the participation by all the States through their representatives in Congress, in proposing amendments. As representatives from nearly one-third of the States were excluded from the Congress proposing the amendments, the constitutional requirement was not complied with; it was violated in letter and in spirit; and the proposing of these amendments to States which were excluded from all participation in their initiation in Congress, is a nullity."[3]

The Arkansas Legislature, by Resolution on December 17, 1866, protested as follows:

"The Constitution authorized two-thirds of both houses of Congress to propose amendments; and, as eleven States were excluded from deliberation and decision upon the one now submitted, the conclusion is inevitable that it is not proposed by legal authority, but in palpable violation of the Constitution."[4]

The Georgia Legislature, by Resolution on November 9, 1866, protested as follows:

"Since the reorganization of the State government, Georgia has elected Senators and Representatives. So has every other State. They have been arbitrarily refused admission to their seats, not on the ground that the qualifications of the members elected did not conform to the fourth paragraph, second section, first article of the Constitution, but because their right of representation was denied by a portion of the States having equal but not greater rights than themselves. They have in fact been forcibly excluded; and, inasmuch as all legislative power granted by the States to the Congress is defined, and this power of exclusion is not among the powers expressly or by implication, the assemblage, at the capitol, of representatives from a portion of the States, to the exclusion of the representatives of another portion,

cannot be a constitutional Congress, when the representation of each State forms an integral part of the whole.

"This amendment is tendered to Georgia for ratification, under that power in the Constitution which authorizes two-thirds of the Congress to propose amendments. We have endeavored to establish that Georgia had a right, in the first place, as a part of the Congress, to act upon the question, 'Shall these amendments be proposed?' Every other excluded State had the same right.

"The first constitutional privilege has been arbitrarily denied. Had these amendments been submitted to a constitutional Congress, they never would have been proposed to the States. Two-thirds of the whole Congress never would have proposed to eleven States voluntarily to reduce their political power in the Union, and at the same time, disfranchise the larger portion of the intellect, integrity and patriotism of eleven co-equal States."[5]

The Florida Legislature, by Resolution of December 5, 1866, protested as follows:

"Let this alteration be made in the organic system and some new and more startling demands may or may not be required by the predominant party previous to allowing the ten States now unlawfully and unconstitutionally deprived of their right of representation to enter the Halls of the National Legislature. Their right to representation is guaranteed by the Constitution of this country and there is no act, not even that of rebellion, can deprive them of its exercise."[6]

The South Carolina Legislature by Resolution of November 27, 1866, protested as follows:

"Eleven of the Southern States, including South Carolina, are deprived of their representation in Congress. Although their Senators and Representatives have been duly elected and have presented themselves for the purpose of taking their seats, their credentials have, in most instances, been laid upon the table without being read, or have been referred to a committee, who have failed to make any report on the subject. In short, Congress has refused to exercise its Constitutional functions, and decide either upon the election, the return, or the qualification of these selected by the States and people to represent us. Some of the Senators and Representatives from the Southern States were prepared to take the test oath, but even these have been persistently ignored, and kept out of the seats to which they were entitled under the Constitution and laws.

"Hence this amendment has not been proposed by 'two-thirds of both Houses' of a legally constituted Congress, and is not, Constitutionally or legitimately, before a single Legislature for ratification."[7]

The North Carolina Legislature protested by Resolution of December 6, 1866 as follows:

"The Federal Constitution declares, in substance, that Congress shall consist of a House of Representatives, composed of members apportioned among the respective States in the ratio of their population, and of a Senate, composed of two members from each State. And in the Article which concerns Amendments, it is expressly provided that 'no State, without it consent, shall be deprived of its equal suffrage in the Senate.' The contemplated Amendment was not proposed to the States by a Congress thus constituted. At the time of its adoption, the eleven seceding States were deprived of representation both in the Senate and House, although they all, except the State of Texas, had Senators and Representatives duly elected and claiming their privileges under

the Constitution. In consequence of this, these States had no voice on the important question of proposing the Amendment. Had they been allowed to give their votes, the proposition would doubtless have failed to command the required two-thirds majority. * * *

If the votes of these States are necessary to a valid ratification of the Amendment, they were equally necessary on the question of proposing it to the States; for it would be difficult, in the opinion of the Committee, to show by what process in logic, men of intelligence could arrive at a different conclusion."[8]

II. JOINT RESOLUTION INEFFECTIVE

Article I, Section 7 provides that not only every bill which shall have been passed by the House of Representatives and the Senate of the United States Congress, but that:

"Every order, resolution, or vote to which the concurrence of the Senate and House of Representatives may be necessary (except on a question of adjournment) shall be presented to the President of the United States; and before the same shall take effect, shall be approved by him, or being disapproved by him shall be repassed by two-thirds of the Senate and House of Representatives, according to the rules and limitations prescribed in the case of a bill."

The Joint Resolution proposing the 14th Amendment[9] was never presented to the President of the United States for his approval, as President Andrew Johnson stated in his message on June 22, 1866.[10] Therefore, the Joint Resolution did not take effect.

III. PROPOSED AMENDMENT NEVER RATIFIED BY THREE-FOURTHS OF THE STATES

1. Premitting the ineffectiveness of said resolution, as above, fifteen (15) States out of the then thirty-seven (37) States of the Union rejected the proposed 14th Amendment between the date of its submission to the States by the Secretary of State on June 16, 1866 and March 24, 1868, thereby further nullifying said resolution and making it impossible for its ratification by the constitutionally required three-fourths of such States, as shown by the rejections thereof by the Legislatures of the following states:

Texas rejected the 14th Amendment on October 27, 1866.[11]

Georgia rejected the 14th Amendment on November 9, 1866.[12]

Florida rejected the 14th Amendment on December 6, 1866.[13]

Alabama rejected the 14th Amendment on December 7, 1866.[14]

North Carolina rejected the 14th Amendment on December 14, 1866.[15]

Arkansas rejected the 14th Amendment on December 17, 1866.[16]

South Carolina rejected the 14th Amendment on December 20, 1866.[17]

Kentucky rejected the 14th Amendment on January 8, 1867.[18]

[1] New Jersey Acts, March 27, 1868.
[2] Alabama House Journal 1866, pp. 210–213.
[3] Texas House Journal, 1866, p. 577.
[4] Arkansas House Journal, 1866, p. 287.

[5] Georgia House Journal, November 9, 1866, pp. 66–67.
[6] Florida House Journal, 1866, p. 76.
[7] South Carolina House Journal, 1866, pp. 33 and 34.

[8] North Carolina Senate Journal, 1866–67, pp. 92 and 93.
[9] 14 Stat. 358 etc.
[10] Senate Journal, 39th Congress, 1st sessn. p. 563, and House Journal p. 889.
[11] House Journal 1866, pp. 578–584—Senate Journal 1866, p. 471.
[12] House Journal 1866, p. 68—Senate Journal 1866, p. 72.
[13] House Journal 1866, p. 76—Senate Journal 1866, p. 8.
[14] House Journal 1866, pp. 210–213—Senate Journal 1866, p. 183.
[15] House Journal 1866–1867, p. 183—Senate Journal 1866–1867, p. 138.
[16] House Journal 1866, pp. 288–291—Senate Journal 1866, p. 262.
[17] House Journal 1866, p. 284—Senate Journal 1866, p. 230.
[18] House Journal 1867, p. 60—Senate Journal 1867, p. 62.

Virginia rejected the 14th Amendment on January 9, 1867.[19]

Louisiana rejected the 14th Amendment on February 6, 1867.[20]

Delaware rejected the 14th Amendment on February 7, 1867.[21]

Maryland rejected the 14th Amendment on March 23, 1867.[22]

Mississippi rejected the 14th Amendment on January 31, 1867.[23]

Ohio rejected the 14th Amendment on January 15, 1868.[24]

New Jersey rejected the 14th Amendment on March 24, 1868.[25]

There was no question that all of the Southern states which rejected the 14th Amendment had legally constituted governments, were fully recognized by the federal government, and were functioning as member states of the Union at the time of their rejection.

President Andrew Johnson, in his Veto message of March 2, 1867,[26] pointed out that:

"It is not denied that the States in question have each of them an actual government with all the powers, executive, judicial and legislative, which properly belong to a free State. They are organized like the other States of the Union, and, like them, they make, administer, and execute the laws which concern their domestic affairs."

If further proof were needed that these States were operating under legally constituted governments as member States in the Union, the ratification of the 13th Amendment by December 8, 1865 undoubtedly supplies this official proof. If the Southern States were not member States of the Union, the 13th Amendment would not have been submitted to their Legislatures for ratification.

2. The 13th Amendment to the United States Constitution was proposed by Joint Resolution of Congress[27] and was approved February 1, 1865 by President Abraham Lincoln, as required by Article I, Section 7 of the United States Constitution. The President's signature is affixed to the Resolution.

The 13th Amendment was ratified by 27 states of the then 36 states of the Union, including the Southern States of Virginia, Louisiana, Arkansas, South Carolina, Alabama, North Carolina and Georgia. This is shown by the Proclamation of the Secretary of State December 18, 1865.[28] Without the votes of these 7 Southern State Legislatures the 13th Amendment would have failed. There can be no doubt but that the ratification by these 7 Southern States of the 13th Amendment again established the fact that their Legislatures and State governments were duly and lawfully constituted and functioning as such under their State Constitutions.

3. Furthermore, on April 2, 1866, President Andrew Johnson issued a proclamation that, "the insurrection which heretofore existed in the States of Georgia, South Carolina, Virginia, North Carolina, Tennessee, Alabama, Louisiana, Arkansas, Mississippi and Florida is at an end, and is henceforth to be so regarded." [29]

[19] House Journal 1866–1867, p. 108—Senate Journal 1866–1867, p. 101.

[20] McPherson, Reconstruction, p. 194; Annual Encyclopedia, p. 452.

[21] House Journal 1867, p. 223—Senate Journal 1867, p. 176.

[22] House Journal 1867, p. 1141—Senate Journal 1867, p. 808.

[23] McPherson, Reconstruction, p. 194.

[24] House Journal 1868, pp. 44–50—Senate Journal 1868, pp. 33–38.

[25] Minutes of the Assembly 1868, p. 743—Senate Journal 1868, p. 356.

[26] House Journal, 39th Congress, 2nd Session, p. 563 etc.

[27] 13 Stat. p. 567.

[28] 13 Stat. p. 774.

[29] Presidential Proclamation No. 153, Gen-

CXIII——986—Part 12

On August 20, 1866, President Andrew Johnson issued another proclamation [30] pointing out the fact that the House of Representatives and Senate had adopted identical Resolutions on July 22nd[31] and July 25th, 1861,[32] that the Civil War forced by disunionists of the Southern States, was not waged for the purpose of conquest or to overthrow the rights and established institutions of those States, but to defend and maintain the supremacy of the Constitution and to preserve the Union with all equality and rights of the several states unimpaired, and that as soon as these objects are accomplished, the war ought to cease. The President's proclamation on June 13, 1865, declared the insurrection in the State of Tennessee had been suppressed.[33] The President's proclamation on April 2, 1866,[34] declared the insurrection in the other Southern States, except Texas, no longer existed. On August 20, 1866,[35] the President proclaimed that the insurrection in the State of Texas had been completely ended; and his proclamation continued: "the insurrection which heretofore existed in the State of Texas is at an end, and is to be henceforth so regarded in that State, as in the other States before named in which the said insurrection was proclaimed to be at an end by the aforesaid proclamation of the second day of April, one thousand, eight hundred and sixty-six.

"And I do further proclaim that the said insurrection is at an end, and that peace, order, tranquility, and civil authority now exist, in and throughout the whole of the United States of America."

4. When the State of Louisiana rejected the 14th Amendment on February 6, 1867, making the 10th state to have rejected the same, or more than one-fourth of the total number of 36 states of the Union as of that date, thus leaving less than three-fourths of the states possibly to ratify the same, the Amendment failed of ratification in fact and in law, and it could not have been revived except by a new Joint Resolution of the Senate and House of Representatives in accordance with Constitutional requirement.

5. Faced with the positive failure of ratification of the 14th Amendment, both Houses of Congress passed over the veto of the President three Acts known as Reconstruction Acts, between the dates of March 2 and July 19, 1867, especially the third of said Acts, 15 Stat. p. 14 etc., designed illegally to remove with "Military force" the lawfully constituted State Legislatures of the 10 Southern States of Virginia, North Carolina, South Carolina, Georgia, Florida, Alabama, Mississippi, Arkansas, Louisiana and Texas. In President Andrew Johnson's Veto message on the Reconstruction Act of March 2, 1867,[36] he pointed out these unconstitutionalities:

"If ever the American citizen should be left to the free exercise of his own judgment, it is when he is engaged in the work of forming the fundamental law under which he is to live. That work is his work, and it cannot properly be taken out of his hands. All this legislation proceeds upon the contrary assumption that the people of each of these States shall have no constitution, except such as may be arbitrarily dictated by Congress, and formed under the restraint of military rule. A plain statement of facts makes this evident.

eral Records of the United States, G.S.A. National Archives and Records Service.

[30] 14 Stat. p. 814.

[31] House Journal, 37th Congress, 1st Sessn. p. 123 etc.

[32] Senate Journal, 37th Congress, 1st Sessn. p. 91 etc.

[33] 13 Stat. 763.

[34] 14 Stat. p. 811.

[35] 14 Stat. 814.

[36] House Journal, 39th Congress, 2nd Sessn. p. 563 etc.

"In all these States there are existing constitutions, framed in the accustomed way by the people. Congress, however, declares that these constitutions are not 'loyal and republican,' and requires the people to form them anew. What, then, in the opinion of Congress, is necessary to make the constitution of a State 'loyal and republican'? The original act answers the question: 'It is universal negro suffrage, a question which the federal Constitution leaves exclusively to the States themselves. All this legislative machinery of martial law, military coercion, and political disfranchisement is avowedly for that purpose and none other. The existing constitutions of the ten States conform to the acknowledged standards of loyalty and republicanism. Indeed, if there are degrees in republican forms of government, their constitutions are more republican now, than when these States—four of which were members of the original thirteen—first became members of the Union."

In President Andrew Johnson's Veto message on the Reconstruction Act on July 19, 1867,[37] he pointed out various unconstitutionalities as follows:

"The veto of the original bill of the 2d of March was based on two distinct grounds, the interference of Congress in matters strictly appertaining to the reserved powers of the States, and the establishment of military tribunals for the trial of citizens in time of peace.

"\* \* \* \* \*

"A singular contradiction is apparent here. Congress declares these local State governments to be illegal governments, and then provides that these illegal governments shall be carried on by federal officers, who are to perform the very duties on its own officers by this illegal State authority. It certainly would be a novel spectacle if Congress should attempt to carry on a legal State government by the agency of its own officers. It is yet more strange that Congress attempts to sustain and carry on an illegal State government by the same federal agency.

"\* \* \* \* \*

"It is now too late to say that these ten political communities are not States of this Union. Declarations to the contrary made in these three acts are contradicted again and again by repeated acts of legislation enacted by Congress from the year 1861 to the year 1867.

"During that period, while these States were in actual rebellion, and after that rebellion was brought to a close, they have been again and again recognized as States of the Union. Representation has been apportioned to them as States. They have been divided into judicial districts for the holding of district and circuit courts of the United States, as States of the Union only can be districted. The last act on this subject was passed July 23, 1866, by which every one of these ten States was arranged into districts and circuits.

"They have been called upon by Congress to act through their legislatures upon at least two amendments to the Constitution of the United States. As States they have ratified one amendment, which required the vote of twenty-seven States of the thirty-six then composing the Union. When the requisite twenty-seven votes were given in favor of that amendment—seven of which States—it was proclaimed to be a part of the Constitution of the United States, and slavery was declared no longer to exist within the United States or any place subject to their jurisdiction. If these seven States were not legal States of the Union, it follows as an inevitable consequence that in some of the States slavery yet exists. It does not exist

[37] 40th Congress, 1st Sessn. House Journal p. 232 etc.



Colm F. Connolly

District of Delaware

US District Court

844 N. King Street

Unit 31

Room 4194

Courtroom 4B

Wilmington DE 19801-3555

FILED

MAY 12 2021

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

7020 1290 0000 5622 3256









U.S. POSTAGE PAID
FCM LG ENV
NEWARK, NJ
07102
MAY 03, 21
AMOUNT

$7.85

R2304Y122886-3